IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

MICHAEL WAYNE HOWELL,           )
                                )
         Petitioner,            )
                                )
vs.                             )     Case No. CIV-07-1008-D
                                )
RANDALL G. WORKMAN, Warden,     )
    Oklahoma State Penitentiary,)
                                )
         Respondent.            )

## MEMORANDUM OPINION

Petitioner, Michael Wayne Howell, is a state court prisoner currently incarcerated

pending the execution of a judgment and sentence of death.  In this action, his second habeas

proceeding, Petitioner challenges a state court determination that he is not mentally retarded.

Petitioner was pursuing his first habeas action[1] when the Supreme Court decided  Atkins v.

Virginia, 536 U.S. 304 (2002).   In Atkins, the Supreme Court held that the Eighth

Amendment prohibits execution of a mentally retarded offender.  Atkins, 536 U.S. at 321.

In May 2005, a jury determined that Petitioner is not mentally retarded.  In Howell v. State,

138 P.3d 549 (Okla. Crim. App. 2006), and in a subsequent post-conviction proceeding,

Howell v. State, No. PCD-2006-712 (Okla. Crim. App. Sept. 10, 2007) (unpublished), the

Oklahoma Court of Criminal Appeals (hereinafter "OCCA") affirmed this finding and the

---

[1] On September 5, 2002, in Case No. CIV-99-1803-A, District Judge Wayne E. Alley denied
Petitioner relief on his original petition.  In Case No. 02-6324, Petitioner appealed the denial to the
Tenth Circuit. Prior to oral argument, Petitioner's appeal was abated pending a mental retardation
determination.

validity of the proceedings conducted.  On September 12, 2007, in Case No. 07-6218, Petitioner received authorization from the Tenth Circuit to file the present action.

In his First Amended Second Petition, Petitioner has presented seventeen[2] grounds for relief.  Doc. 22 (hereinafter "Petition").  In addition to his Petition, Petitioner also filed a motion to amend his Petition and a motion for evidentiary hearing, both of which have been denied.  Docs. 37 and 38.  Respondent has responded to the Petition, Doc. 29 (hereinafter "Response"), and provided the state court record.[3]  After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to relief.

## I.  Respondent's Motion to Dismiss.

In his Response, Respondent argues that all but one of Petitioner's claims should be dismissed.  Citing 28 U.S.C. § 2244(b)(2)(A) and (b)(4), Respondent asserts that the only claim which Petitioner should be allowed to maintain in this successive action is his Ground 11, a claim regarding the sufficiency of the evidence.  Respondent contends that Petitioner's other claims, which include prosecutorial misconduct, jury instructions, evidentiary matters, and ineffective assistance of counsel, "reach[] far beyond the holding in Atkins" and are therefore "not based upon a new rule of constitutional law."  Response, pp. 9, 10-11.

---

[2] Petitioner's grounds for relief are numbered 1 through 18; however, Petitioner has abandoned his Ground 2.  Petition, p. 34.

[3] Reference herein to the state court record will be as follows: original record (O.R.) and mental retardation trial transcripts (Tr.).

Petitioner was given authorization by the Tenth Circuit to file a second petition presenting an Atkins challenge.  In accordance with Ochoa v. Sirmons, 485 F.3d 538 (10th Cir. 2007), the Tenth Circuit found that Petitioner satisfied the requirements of Section 2244(b)(2)(A).  Ochoa makes clear, however, that the Tenth Circuit's authorization is but a preliminary determination and that it is up to the district court to make the final determination as to whether Petitioner's claims satisfy the requirements for a second petition. Ochoa, 485 F.3d at 543.

The Court concurs with the conclusion of the Tenth Circuit that this action is authorized by Section 2244(b)(2)(A).  Pursuant to Atkins, which establishes a new rule of constitutional law with retroactive application, Petitioner sought out and received a state court determination on the issue of his mental retardation.  He challenged that determination through appropriate state appeals and appears now before this Court with seventeen claims, all of which relate to his mental retardation trial.  All of these claims were previously unavailable to Petitioner, but arose out of the Atkins inquiry conducted in state court. All were presented to the OCCA and addressed on the merits.[4]  Accordingly, the Court finds that all of Petitioner's claims are proper, and Respondent's motion to dismiss is denied.  See Ochoa v. Workman, No. CIV-06-1348-R, 2010 WL 915826 (W.D. Okla. Mar. 10, 2010) (unpublished) (addressing all Atkins-related claims in a second habeas petition).

_____

[4] Although his initial appeal was part of a post-conviction proceeding, the OCCA reviewed the errors alleged therein as though raised on direct appeal.  Howell, 138 P.3d at 554.  Claims raised in Petitioner's subsequent post-conviction proceeding were reviewed on the merits as well due to Petitioner's related allegation of trial counsel ineffectiveness.  Howell, No. PCD-2006-712, slip op. at 4-21.

## II.  Standard of Review.

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the Court's ability to grant habeas corpus relief to state prisoners is limited.  When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, the Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The focus of Section 2254(d) is on the reasonableness of the state court's decision. To obtain relief, a petitioner must show that the state court decision is "objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II).  See Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011) (acknowledging that Section 2254(d) places a difficult burden of proof on the petitioner). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded

jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Harrington v. Richter</u>, 562 U.S. ___, 131 S.Ct. 770, 786 (2011). Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Id.</u> The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Id.</u> (citation omitted).

### III.  Summary of the Evidence.

On May 23-27, 2005, a jury trial was held on the issue of Petitioner's mental retardation. Petitioner, who elected not to be present during the proceedings, was represented by two court-appointed attorneys. Three witnesses, a psychologist and two siblings, testified on Petitioner's behalf. The State presented four witnesses, including a psychologist, a prosecutor, a police officer, and Petitioner's co-defendant. The jury was instructed that it had to find Petitioner mentally retarded if he proved by a preponderance of the evidence that he had significant sub-average intellectual functioning, which manifested itself before age eighteen, and significant limitations in adaptive functions. The jury unanimously determined that Petitioner is not mentally retarded.

### A.    Petitioner's Evidence.

Dr. Daniel H. Grant, a licensed psychologist, met with Petitioner in November 2002 (Tr. II, 297, 339). Dr. Grant administered numerous tests to Petitioner, including three intelligence tests (Tr. II, 339-40; Defendant's Exhibit 6). On the Wechsler Adult Intelligence

Scale, Third Revision (WAIS-III), Petitioner scored a 73 (Tr. II, 341); on the Stanford-Binet Intelligence Scale, Fourth Edition, Petitioner scored a 62 (Tr. II, 343); and on the Comprehensive Test of Non-Verbal Intelligence, Petitioner scored a 67 (Tr. II, 345). Dr. Grant testified that all of these scores showed significantly sub-average intelligence (Tr. II, 369).[5]  Dr. Grant also tested Petitioner's adaptive behavior using the Independent Living Scale. Dr. Grant testified that Petitioner's scores on this test correspond to a 61 on the WAIS-III and therefore indicate that Petitioner has an adaptive functioning level within the range of mental retardation (Tr. II, 363, 365-68).   Dr. Grant's ultimate conclusion was that Petitioner met the clinical definition of mental retardation (Tr. II, 393).

Petitioner's younger sister, Brenda Lee Hunter, testified regarding all the assistance she had to give Petitioner when they were kids.  She had to help him get dressed, tie his shoes, and comb his hair (Tr. IV, 645-46).  She testified that Petitioner had difficulty speaking so that others could understand and that he did not learn his alphabet until he was nine years old (Tr. IV, 646-47).

Petitioner's younger brother, David Allen Howell, also testified.  He testified that he and Petitioner were in the same grade and that they were in special education classes together (Tr. IV, 655).  Mr. Howell testified that other kids made fun of them.  They were called "retarded" and "flag boys" because they were in special education and because of the

---

[5] A normal IQ is 100.  Given a standard deviation of fifteen points, sixty-eight percent of the general population falls in the average range of eighty-five to 115. Approximately two percent of the population falls in the mentally-retarded range with an IQ of seventy or below (Tr. II, 315-16, 318-20; Defendant's Exhibit 2).

Fs they made (Tr. IV, 655-56). Mr. Howell testified about the jobs he and Petitioner had when they were teenagers (Tr. IV, 656-59). He also testified that Petitioner never lived alone (Tr. IV, 660).

**B.    State's Evidence.**

Dr. John Robert Hutson, a licensed clinical psychologist, met with Petitioner in February 2005 (Tr. IV, 665-66, 683). Dr. Hutson interviewed Petitioner and administered two tests, the WAIS-III and the M-test (a malingering test) (Tr. IV, 684-85). Dr. Hutson gave the M-test after the WAIS-III because he "was very uncomfortable with the effort [Petitioner] had put forth" on the WAIS-III (Tr. IV, 686). Dr. Hutson noted that rather than give thought to an answer, Petitioner would say he did not know, and on timed items, Petitioner deliberately worked slower (Tr. IV, 687-88). Thus, although Petitioner scored a 66 on the WAIS-III he administered, Dr. Hutson concluded that this was not a valid assessment of his intellectual functioning (Tr. IV, 686, 690). Although Petitioner was not malingering, Dr. Hutson believed that Petitioner simply did not care and that he did not put forth the effort to obtain a valid score (Tr. IV, 690-91). Based on his interview with Petitioner, prior test results, and review of other historical material regarding Petitioner, Dr. Hutson opined that the lowest score Petitioner could obtain if giving his best effort was an 80 (Tr. IV, 695-96).

In addition to the issue of Petitioner's intellectual functioning, Dr. Hutson testified that he had reviewed Petitioner's school records and saw no evidence that Petitioner had been in special education classes. Familiar with the Shelby County School System, Dr. Hutson

testified that it "was a good system for evaluating back in those days."  In order to get into a special education or "resource" class, Petitioner would have had to have been diagnosed or evaluated.  The records did not show any such testing or placement (Tr. IV, 701-03).  As to Petitioner's adaptive functioning, Dr. Hutson did not conduct any particular testing, but testified that based on his interaction with Petitioner and his knowledge of Petitioner's history, Petitioner had social skills, was an effective communicator, and could care for himself (Tr. IV, 703-05).  Dr. Hutson's ultimate conclusion was that Petitioner is not mentally retarded (Tr. IV, 706).

District Judge Ray C. Elliott, a former assistant district attorney who prosecuted Petitioner, testified as to his observations of Petitioner.  He testified that Petitioner was an active participant in his 1988 trial.  He was observant, listened carefully to the testimony, and interacted with his lawyers.  Petitioner testified in his defense, and no concern about his ability to do so was ever expressed (Tr. III, 609-13).  Through Judge Elliott, portions of Petitioner's direct examination testimony were read aloud to the jury (Tr. III, 613, 615, 617-20).[6]  The jury also watched a redacted videotape of Petitioner's cross-examination testimony (Tr. III,  620-21, 622-23; State's Exhibit 13).  In addition, a portion of a transcript from Petitioner's 1996 retrial was read to the jury.  In particular, the jury heard an in chambers conversation between Petitioner and the trial court regarding Petitioner's desire not

---

[6] A copy of the transcript, labeled "Attachment 1," was made a part of the record in Case No. PCD-2003-268.  Howell, 138 P.3d at 558 n.4.

to be present for trial, instructions, and a conflict with one of his attorneys (Tr. III, 624-36).[7] Based on his interactions with Petitioner, Judge Elliott  believed that Petitioner had the ability to understand and process information, to communicate, to learn from experience, and to control his impulses.  He did not believe that Petitioner was mentally retarded (Tr. III, 639-41).

Del City Police Chief Phil Taylor testified about his investigation of Petitioner's crime which occurred in November 1987.  Chief Taylor testified about Petitioner's attempts to hide and/or destroy evidence and his efforts to avoid being captured (Tr. IV, 736-42). Chief Taylor also testified about his personal contact with Petitioner.  Chief Taylor testified that Petitioner understood his constitutional rights and had the mental faculties to respond to his questions (Tr. IV, 742-43).

Petitioner's co-defendant, Mona Lisa Watson, also testified.  She identified four letters which Petitioner wrote to her in 1989 (Tr. IV, 746-47; State's Exhibits 9-12).  She testified that she and Petitioner got married while they were incarcerated so that they could  write each other.  Unless they were married, prison rules prohibited such communication (Tr. IV, 750-51).

---

[7] A copy of the transcript, labeled "Attachment 2," was made a part of the record in Case No. PCD-2003-268.  Howell, 138 P.3d at 558 n.4.

## IV.  Analysis.

### A.    Ground 11:  Sufficiency of the Evidence.

The paramount question in this proceeding is whether Petitioner is mentally retarded. Pursuant to <u>Atkins</u>, if Petitioner is mentally retarded, then his death sentence is an impermissible punishment.   In his Ground 11, Petitioner presents a challenge to the sufficiency of the evidence.   Petitioner asserts that the evidence presented at his mental retardation trial shows conclusively that he is in fact mentally retarded.  Petitioner argues that "[t]o ignore this evidence and to blindly follow the jury's tainted verdict and the state court's erroneous ruling is to violate the mandate of <u>Atkins</u>."  Petition, pp. 46-47.

Review of this claim requires layers of deference.  First, since the OCCA reviewed the sufficiency claim on the merits, AEDPA deference applies.  Second, in deciding the claim, the OCCA made several determinations of fact.  Pursuant to 28 U.S.C. § 2254(e)(1), these facts are presumed correct, unless Petitioner rebuts the presumption by clear and convincing evidence.  Third, in the present case, the issue of Petitioner's mental retardation was presented to a jury.  Because it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts[,]" <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979), review of jury verdicts is "'sharply limited'" and this Court "must accept the jury's determination as long as it is within the bounds of reason." <u>Boltz v. Mullin</u>, 415 F.3d 1215, 1232 (10th Cir. 2005) (citation omitted) (discussing <u>Jackson</u>).

In Atkins, the Supreme Court did not mandate specific procedures for the enforcement of its holding. Instead, States were tasked to develop "'appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" Atkins, 536 U.S. at 317 (quoting Ford v. Wainwright, 477 U.S. 399, 416-17 (1986)). At the time of Petitioner's mental retardation trial, a legislative procedure had yet to be adopted in Oklahoma, but as detailed by the OCCA in its decision denying Petitioner relief, the following procedures had been developed through case law pronouncement:

> To prove mental retardation, Howell was required to show, by a preponderance of the evidence, 1) that he functions at a significantly sub-average intellectual level that substantially limits his ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; 2) that his mental retardation manifested itself before the age of 18; and 3) that he has significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work. Myers, 2005 OK CR 22, ¶ 6, 130 P.3d at 266; Murphy, 2002 OK CR 32, ¶ 31, 54 P.3d at 567-568. The issue of mental retardation is a factual issue which was resolved by the jury, and we afford the jury's decision great deference. Myers, id. at ¶ 7, 130 P.3d at 266-267. We will not disturb a jury's verdict where there is any competent evidence reasonably tending to support it. Id. When a defendant/petitioner challenges the sufficiency of the evidence following a jury's verdict that he or she is not mentally retarded, this Court will review the evidence in a light most favorable to the State to determine if any rational trier of fact could have reached the same conclusion. Id.

Howell, 138 P.3d at 562. Within this framework, the OCCA reviewed the presented evidence and found as follows:

> Applying this standard of review to the present case, we find the record supports the jury's verdict that Howell is not mentally retarded. Howell was administered various intelligence tests over the years and his scores ranged

11

from 62 to 91. Howell's scores on tests administered by his expert, Dr. Grant, ranged from 62 to 73. Dr. Grant also administered various academic and adaptive functioning tests and concluded Howell's results on those tests were consistent with his IQ performances. He testified Howell is mentally retarded and has significantly sub-average general intellectual functioning and significantly impaired adaptive skills.

Howell's sister Brenda testified that as one of nine children, Howell was raised in an environment of extreme poverty. Although she was three years younger than Howell, she said she had to help him dress from the time she was about five years old. She said he had difficulty with speech and she often could not understand what he was saying. She said she taught Howell his ABCs when he was nine.

Howell's brother David testified that as children, they often had no food to eat. He said they lived in extreme poverty. David said he and Michael attended school in the same grade and were in special education classes. David said other children made fun of them and called them retarded because they were in special education classes. David said the other children called them "flag boys" because they made "F"s. David said Michael had several jobs. He worked for his father's garbage service picking up garbage, for Ross Metals loading batteries onto a conveyor belt, and for Gene Carnell as a laborer. David said he never knew of a time when Michael lived alone.

The State's expert, Dr. John Hutson, did not find Howell mentally retarded. Although Howell scored a 62 [sic][8] on the WAIS-III administered by Dr. Hutson, Dr. Hutson was uncomfortable with the level of effort Howell put into the test. He said Howell's scores were simply not consistent with his presentation in talking and interacting. During his evaluation, Howell responded appropriately, without difficulty, and fairly rapidly to questions. Although Dr. Hutson did not think Howell was malingering, he thought Howell acted like he did not care and did not put forth his best effort on the tests. Dr. Hutson thought with his best efforts, Howell's minimal IQ score would be near 80. He based that opinion on his interactions and conversations with Howell and upon his review of Howell's conversation with Judge Freeman in 1996 when Howell wanted to discharge one of his attorneys and to be absent from the courtroom. In the exchange with Judge Freeman, Dr. Hutson noted Howell expressed concern about his injured leg and was able

---

[8] As previously noted, Petitioner scored a 66 on the IQ test administered by Dr. Hutson.

to communicate objectives in multi-syllabic words, communicate ideas, and make cogent arguments.

Dr. Hutson also noted Howell's use of community resources where Howell requested sentence reduction or commutation by written correspondence which contained reasonable arguments. He achieved a welding certification and received a commendation for his work activities while incarcerated in Wyoming. Dr. Hutson testified Howell's ability to escape successfully from incarceration showed his intellectual ability. Dr. Hutson stated he had not seen any evidence that Howell was in special education classes while attending school as a child. Dr. Hutson said Howell did not suffer from significant limitations in social skills (noting Howell fared well in his social scene as a drug user and that he was married), communication skills, self-care, work, and use of community resources.

The evidence presented at the trial shows Howell did not meet even the first prong of the definition of mental retardation. Murphy, 2002 OK CR 32, ¶ 31, 54 P.3d at 567. Although Howell presented evidence he obtained IQ scores lower than 70 on a couple of occasions, his effort on those tests was questionable. The jury could properly consider Howell's scores above 70 and conclude he functioned at a higher level. An IQ score of 70 or below alone is not determinative of mental retardation. See Pickens v. State, 2005 OK CR 27, ¶ 14, 126 P.3d 612, 616 (other evidence of low intellectual functioning may be considered in determining whether someone has sub-average intellectual ability which limits one's ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses and to understand the reactions of others). Other evidence, besides the testing scores, suggested that Howell was not limited in his abilities to understand and process information, not limited in communications skills, was able to learn from experiences or mistakes, was able to engage in logical reasoning, and was able to understand the reactions of others.

The school records which were admitted at trial show Howell made poor and often failing grades; however, these records do not show he was identified as in need of special education. School records of his siblings Brenda and David were admitted and their records show they were identified as special education students. From this evidence, the jury could have concluded his siblings were in special education, but Howell was not. The jury might also have found Howell's poor academic performance during the time

13

he attended school was due to lack of effort, absences, or environmental factors rather than lack of ability.

His hand-written letters to Mona Lisa Watson show he communicated well in writing; he could understand and process information, learn from experience or mistakes, engage in logical reasoning and understand the reactions of others. The fact that he wrote these letters showed he was able to maintain a relationship with Watson and were reflective of his social/interpersonal skills.

The portions of Howell's testimony from the prior hearings which were properly admitted also illustrate Howell does not function at a significantly sub-average level. His trial testimony from 1988 showed he could understand and process information, communicate, engage in logical reasoning, and understand the reactions of others. His exchange with Judge Freeman in 1996 about his broken leg, about discharging his attorney, and about remaining at the court proceedings reflected his ability to understand and process information, communicate, engage in logical reasoning, and understand the reactions of others.

The admissible evidence, viewed in a light most favorable to the State, showed Howell did not function at a significantly sub-average level that substantially limited his abilities to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others. See Myers, 2005 OK CR 22, ¶ 7, 130 P.3d 262 (when a defendant challenges the sufficiency of the evidence following a jury finding that he/she is not mentally retarded, this Court will review the evidence in a light most favorable to the State). Even though some evidence relating to the crimes Howell committed was improperly admitted, we find this evidence did not contribute to the jury's verdict, and its admission was harmless beyond a reasonable doubt. Chapman, 386 U.S. at 24, 87 S.Ct. at 828. Howell did not establish, by a preponderance of the evidence, that he is mentally retarded and even if the evidence admitted

in violation of <u>Lambert</u> had not been admitted, the evidence still would not
have supported a verdict that Howell is mentally retarded.[9]

<u>Howell</u>, 138 P.3d at 562-64 (footnote omitted).

Having conducted its own thorough review of the evidence presented, the Court
concludes that the decision of the OCCA is neither contrary to nor an unreasonable
application of Supreme Court law, nor an unreasonable determination of the facts.  Contrary
to Petitioner's assertion, the evidence presented was not conclusive but disputed.  Based on
the evidence presented, a rational juror could have concluded that Petitioner is not mentally
retarded.  Thus, the OCCA's decision is not contrary to or an unreasonable application of
either <u>Atkins</u> or <u>Jackson</u>, and Petitioner's Ground 11 is denied.

### B.    Remaining Grounds.

As previously noted, in addition to his Ground 11 presenting a challenge to the
sufficiency of the evidence, Petitioner raises sixteen additional claims.  All of these claims
arose from the mental retardation trial.  They are claims typically presented in a habeas
corpus challenge to a state court judgment and sentence.  In his presentation of these claims,
Petitioner argues that relief is warranted under <u>Atkins</u> because these errors denied him due
process and a fundamentally fair trial.  Although <u>Atkins</u> does not specifically address the due
process implications of its ruling, it is clear that a capital offender is entitled to due process
in a mental retardation determination.

---

[9] <u>See</u> Section IV.B.2.e., <u>infra</u>, discussing Petitioner's Ground 9 and the improperly admitted
evidence.

Like Ford's prohibition against the execution of an incompetent, Atkins delineates another circumstance in which the death penalty is an inappropriate punishment, i.e., a mentally retarded offender shall not be subject to execution for his crime.  In Ford, the Supreme Court acknowledged that a state's procedures to determine competency to be executed required compliance with due process and fundamental fairness.  See Panetti v. Quarterman, 551 U.S. 930, 948-52 (2007) (discussing the due process requirements of Ford).  While Atkins is silent on this point, its reliance on Ford, the similarity of the issues, and the Supreme Court's subsequent acknowledgment in Schriro v. Smith, 546 U.S. 6 (2005),[10] support a finding that the mental retardation determination conducted by the State must satisfy due process.  In this light, the Court reviews Petitioner's remaining claims.

---

[10] In Schriro, the issue was the Ninth Circuit's decision ordering the State of Arizona to provide the defendant a jury trial on the issue of mental retardation.  Given its statement in Atkins authorizing States to develop appropriate procedures for the determination of mental retardation, the Supreme Court found that the Ninth Circuit erred in ordering a jury trial.

> States, including Arizona, have responded to that challenge by adopting their own measures for adjudicating claims of mental retardation. *While those measures might, in their application, be subject to constitutional challenge*, Arizona had not even had a chance to apply its chosen procedures when the Ninth Circuit pre-emptively imposed its jury trial condition.

Schriro, 546 U.S. at 7-8 (emphasis added).  Thus, while refusing to impose any particular requirements upon the States, the Court acknowledged that the procedures employed could "be subject to constitutional challenge."  Id. at 7.  See also Pierce v. Thaler, 604 F.3d 197, 217-21 (5th Cir. 2010) (Dennis, J., concurring in part and dissenting in part) (citing Atkins and Schriro, among other Supreme Court cases, and concluding that a capital offender should be afforded due process protections in a mental retardation determination).

1.      **Prosecutorial Misconduct (Ground 1).**

In his Ground 1, Petitioner complains about the prosecutor's opening statement. Alleging that the prosecutor violated <u>Lambert v. State</u>, 71 P.3d 30 (Okla. Crim. App. 2003), by improperly referring to the facts of his capital crime, Petitioner asserts that the jury was tainted from the outset and he was therefore denied an adequate and fair hearing on the issue of his mental retardation.

In <u>Lambert</u>, the OCCA remanded the case to the district court for a mental retardation determination.  In so doing, it held as follows:

> The proceeding on remand is solely devoted to the question of Lambert's mental retardation. Both parties may call witnesses and present evidence bearing on mental retardation. Lambert's criminal conviction and death sentence are not relevant to this issue. The jury should not hear evidence of the crimes for which Lambert was convicted, unless particular facts of the case are relevant to the issue of mental retardation. Any such evidence should be narrowly confined to that issue. The jury should not hear evidence in aggravation or mitigation of the murders for which Lambert was convicted, or any victim impact evidence. The only issue is whether Lambert meets the <u>Murphy</u> definition for mental retardation. The jury shall be convened to discover whether Lambert can show it is more likely than not that he is mentally retarded.

<u>Lambert</u>, 71 P.3d at 31 (footnote omitted).

Addressing Petitioner's claim of <u>Lambert</u> error, the OCCA reviewed the prosecutor's opening statement and Petitioner's objections thereto.

> The prosecutor in this case talked about Howell's involvement in the criminal justice system, his incarceration and escape from a correctional facility, and his involvement in drug trafficking and in particular a drug deal gone awry. After the prosecutor mentioned Petitioner's escape from a correctional facility, Petitioner's counsel objected that the statement was beyond the proper scope of opening statement and the objection was properly

17

overruled. The prosecutor was outlining the evidence which she intended to present at trial. Next Petitioner's counsel objected to the prosecutor's statement that Petitioner was part of a numbers racket. The trial court properly overruled this objection noting the prosecutor merely stated what Petitioner said during his own testimony. Counsel's last objection came after the prosecutor referred to Howell's testimony that "people get killed over dope and money." Counsel argued the prosecutor had indirectly referred to the facts of the capital crime – someone getting killed over drugs and money. This objection too was properly overruled as no specific mention of Howell's capital crime occurred and the prosecutor's statement was made to explain Howell's actions stemming from his involvement in cocaine distribution.

Howell, 138 P.3d at 556.  From this review, the OCCA determined that "[t]he trial court, upon counsel's objections, properly determined the prosecutor had not exceeded the proper scope of opening statement and had not exceeded the boundaries enunciated in Lambert." Id.

Allegations of prosecutorial misconduct are subjected to due process review. Hamilton v. Mullin, 436 F.3d 1181, 1187 (10th Cir. 2006).  The question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Having reviewed the prosecutor's opening statement, the Court cannot find that the OCCA unreasonably determined the claim.

Oklahoma's Lambert rule is well-reasoned.  The focus of an Atkins mental retardation trial should be on a defendant's mental abilities and adaptive functioning. However, when, as in the present case, a defendant's prior crimes and incarceration history are relevant to the issue of mental retardation, they are properly admitted.  All of the comments to which Petitioner complains related to matters subsequently explored at trial.  For example,

18

Petitioner's incarceration in a Wyoming prison: the prosecutor referred to the same in opening statement (Tr. II, 274-75, 282), and evidence was admitted regarding intelligence testing done there (Tr. II, 423; State's Exhibit 7); the programs he completed (Tr. II, 424-28; Tr. IV, 698; State's Exhibits 2-5); his requests for a sentence reduction (or commutation) and transfer (Tr. IV, 698); and his successful escape (Tr. IV, 698). Because this evidence was directly relevant to the issue of Petitioner's mental capabilities and ability to function, it was proper for admission and proper for comment by the prosecutor in opening statement. Petitioner's Ground 1 is therefore denied.

### 2. Evidentiary Issues.

In his Grounds 3, 4, 5, 6, 9, 16, and 17, Petitioner presents multiple evidentiary challenges to the State's evidence. It is well-established that "[f]ederal habeas review is not available to correct state law evidentiary errors. . . ." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999). See also Thornburg v. Mullin, 422 F.3d 1113, 1128-29 (10th Cir. 2005) (quoting Smallwood); Spears v. Mullin, 343 F.3d 1215, 1225-26 (10th Cir. 2003) (same). Thus, when a habeas petitioner complains about the admission of evidence, inquiry is limited to the constitutional issue of whether a due process violation has occurred. The question is whether the admitted evidence rendered Petitioner's trial fundamentally unfair. Id.

a.      **Opinion Testimony (Ground 3).**

In his Ground 3, Petitioner asserts error in the testimony of Chief Taylor.  As previously noted, Chief Taylor testified about his investigation of Petitioner's crime.  At the conclusion of Chief Taylor's testimony, he was asked about his observations of Petitioner.  In particular, Chief Taylor was asked if he ever saw Petitioner do anything that made him question Petitioner's mental functioning.  Over defense objection, Chief Taylor answered in the negative.  Chief Taylor further testified that it never occurred to him that Petitioner might be mentally retarded (Tr. IV, 743).  Citing <u>Lambert</u> and <u>Atkins</u>, Petitioner presented this alleged error to the OCCA.[11]  The OCCA denied relief.

> Admission of evidence is within the trial court's discretion, and will be disturbed only upon a showing of prejudice. Opinion testimony of a lay witness is permissible under 12 O.S.2001, § 2701 when it is rationally based on the perception of the witness and is helpful to the determination of a fact in issue. Officer Taylor's opinion and perception of Howell's level of mental functioning was properly admitted and the trial court did not abuse its discretion. Taylor's testimony was based upon his interactions with Howell and his observations of Howell's ability to communicate with Officer Taylor and others. His observation and lay opinion was relevant and helpful to the

---

[11] Petitioner's presentation of the claim to this Court appears to be an expansion of the claim presented to the OCCA.  In his Supplemental Brief to the OCCA, p. 7, Petitioner complained only of the opinion testimony contained on transcript page 743.  Here, Petitioner raises that claim, but then additionally argues that the entirety of Chief Taylor's testimony was improper under <u>Lambert</u> because it contained details of his crime.  Irrespective of the matter of exhaustion, the Court finds this additional claim to be without merit.  <u>See</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Chief Taylor's testimony about Petitioner's attempt to hide and/or destroy evidence and his efforts to avoid being captured were relevant to his mental function and adaptive abilities.  Thus, the admission of this evidence did not deny Petitioner a fundamentally fair trial.

jury's determination of the first and third prongs of the definition of mental retardation as set forth in Murphy.

Howell, 138 P.3d at 556-57 (citations omitted).

Petitioner has not shown that this decision of the OCCA is unreasonable.  While Petitioner complains that this testimony constituted improper expert opinion, he fails to challenge the OCCA's holding that the testimony was permitted as lay opinion testimony. The Oklahoma rule on the admissibility of lay opinion, which mirrors the federal rule, provides that a non-expert witness may offer his opinion when it is "[r]ationally based on [his] perception . . . [and] [h]elpful to a clear understanding of his testimony or the determination of a fact in issue. . . ."  Okla. Stat. tit. 12, § 2701 (Supp. 2002).  As the OCCA found, Chief Taylor's testimony was based on his interactions with Petitioner.  Chief Taylor did not express an expert opinion on whether or not Petitioner was mentally retarded.  The substance of his testimony was that he did not "*observe* anything that made [him] question [Petitioner's] level of mental functioning" (Tr. IV, 743) (emphasis added).  As this is proper lay opinion, no relief is warranted on Petitioner's Ground 3.  Cf. United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011) (discussing Fed. R. Evid. 701 and acknowledging that the federal rules of evidence do not prevent a lay witness from testifying as to a defendant's mental state).

### b.     Testimony Regarding Petitioner's Competence to Testify (Ground 4).

In his Ground 4, Petitioner alleges error in the testimony given by Judge Elliott, who was, at the time of Petitioner's original trial, one of the prosecutors.  In particular, Petitioner

asserts that Judge Elliott should not have been allowed to testify that no concerns were ever

raised (and that he personally had no concerns) about Petitioner's ability to testify in his first

trial (Tr. III, 612-13).   Similar to his complaint with Chief Taylor's testimony, Petitioner

argues that this testimony was improper because Judge Elliott is not a mental health expert

capable of rendering an opinion on Petitioner's competence to testify.

> In denying Petitioner relief on this claim, the OCCA found as follows:

> > The trial court did not abuse its discretion in allowing this testimony. Judge Elliott's observation that neither Howell nor any of the attorneys involved in his 1988 criminal proceeding objected to his decision to testify on the grounds that he was not mentally capable of making that decision was relevant to the jury's determination of both the first and third prong of the definition of mental retardation as set forth in Murphy. From Judge Elliott's observation that no one objected to Howell's ability to testify or to make the decision to testify, a rational juror could properly infer Howell's counsel found him to be a competent witness.

Howell, 138 P.3d at 557 (citation omitted).

Again, Petitioner has not demonstrated to this Court that this evidentiary ruling is an

unreasonable one which denied him a fundamentally fair trial.   Petitioner's ability to testify

was relevant.   From Judge Elliott's perspective as a participant in Petitioner's first trial,

Petitioner was mentally capable of making the choice to testify and had the mental capability

to actually testify before the jury.   Judge Elliott's assessment of the situation, however, was

not the only evidence upon which the jury had to rely. The jury heard a large portion of

Petitioner's direct examination testimony and then watched a portion of his cross-

examination testimony.   So, while Judge Elliott's opinion was relevant to the jury's

determination, the jury was able to make its own assessment about Petitioner's competence

to testify.  Under these circumstances, the Court cannot find that the admitted evidence denied Petitioner a fundamentally fair trial.  Ground 4 is denied.

### c. Letters to Petitioner's Co-Defendant (State's Exhibits 9-12) (Ground 5).

In his Ground 5, Petitioner complains about the admission of four letters written to his co-defendant, Ms. Watson (State's Exhibits 9-12).  Although Petitioner acknowledges that the letters may have been "somewhat relevant when viewed in isolation," Petition, p. 38, Petitioner argues that they were substantially more prejudicial than probative, given the prosecution's use of the letters and the absence of evidence showing the circumstances under which they were written, i.e., whether Petitioner actually authored the letters, whether he had any assistance, and how long it took him.

As previously noted, the State presented Ms. Watson for the purpose of sponsoring the letters.  Ms. Watson identified State's Exhibits 9-12 as letters she received from Petitioner.  The letters were written in February 1988 while both Petitioner and Ms. Watson were incarcerated in Florida (Tr. IV, 746-47; State's Exhibits 9-12).  In the letters, Petitioner describes the depth of his relationship with Ms. Watson and repeatedly professes his love for her.  Petitioner expresses his feelings of betrayal upon learning that she has given statements to the police: "Mona why didn't you tell me you told them everything.  I can't believe you did that to us."  He warns her about the consequences of being a "rat," and reminds her that she knows how to take "the 5th" or just say, "I don't remember."  He tells her that the district attorney has been stopping their mail and that he intends to respond by filing a lawsuit

23

against him.   In closing argument, the prosecutor read a large portion of the letters to the jury (Tr. IV, 781-91).

In denying Petitioner relief on this claim, the OCCA found that the letters were properly admitted as relevant evidence and that the prosecutor's reference to them in closing argument was proper.

> State's Exhibits 9-12 were offered for the purpose of showing his ability to communicate, to understand and engage in logical reasoning, to show he understood the consequences of his actions and had the ability to learn from his mistakes, and to show he did not have deficits in social and interpersonal skills. The letters were properly admitted, and the State's reference to, and reading from, them in closing argument was within the proper boundaries of acceptable argument.

Howell, 138 P.3d at 557 (citation omitted).  Having reviewed the letters and the prosecutor's closing argument, the Court concurs with the OCCA's holding.  The letters were relevant to the jury's determination of whether or not Petitioner is mentally retarded.  Because the letters were relevant, their admission cannot be said to have denied Petitioner a fundamentally fair trial.  Relief on Ground 5 is denied.

### d.      Petitioner's Profanity (Ground 6).

In his Ground 6, Petitioner asserts that he was prejudiced by the prosecutor's repeated references to his own profanity-ridden statements (answers to questions given during intelligence testing, his trial testimony, and letters).  Petitioner asserts that the prosecutor's actions were an intentional effort to attack his character and distract the jury from the issue at hand. Petitioner challenges the relevance of the evidence, but additionally argues that if any relevance existed, it was outweighed by prejudicial effect.

24

Petitioner presented this claim to the OCCA without success.  The OCCA addressed the claim as follows:

> In his sixth claim, counsel for Petitioner argues that evidence of Petitioner's use of profanity denied him of a fundamentally fair jury trial on mental retardation. Counsel objected on three different occasions, noting that Howell's use of the "F" word, variations thereof, and the use of other cuss words were shocking to the sensibilities of the jury and were extremely prejudicial. The trial court properly overruled counsel's objections, noting the way he phrased his answers showed his contempt for the process and were demonstrative of his attitude and understanding of the proceedings. Howell's use of profanity in his everyday language, while unpleasant to hear, were not so prejudicial as to render his complete statements inadmissible. 12 O.S.Supp.2003, § 2403 (relevant evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice). The trial court did not abuse its discretion when it allowed the prosecutor to reference Howell's actual words in its examination of witnesses and closing argument and no relief is warranted on this claim.

Howell, 138 P.3d at 557 (citation omitted).  "[A] federal court on habeas review will not disturb the state court's evidentiary ruling unless it was 'so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" Wilson v. Sirmons, 536 F.3d 1064, 1101 (10th Cir. 2008) (quoting Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000)).  Petitioner's claim falls far short of meeting this high standard for relief.

Petitioner's statements were relevant to the jury's determination.  The fact that they contained profanity did not alter their relevance, and there is no indication that the prosecutor used the statements to unduly attack Petitioner.  For example, in opening statement, the prosecutor stated as follows:

> There's a question about health and safety.  Question is, suppose you are home alone and not expecting anyone.  There's a knock at your door about 10:00 at night.  What would you do? Michael Wayne Howell's answer is, "ask them what the fuck they want".
>
> Does he understand the questions that he's being asked?  I submit to you the evidence is going to be clear.

(Tr. II, 284).   Here, the prosecutor referenced Petitioner's own statement to show his intellectual capabilities and his adaptive functioning in the area of health and safety.   This relevance was not outweighed by any prejudicial effect flowing from Petitioner's use of profanity.  This is true for all of Petitioner's record references, viewed both individually and collectively.  Because the OCCA reasonably denied Petitioner relief on this claim, no relief is warranted on his Ground 6.

### e.      Evidence of Petitioner's Crimes (Ground 9).

In his Ground 9, Petitioner raises a "cumulative error" type claim.  An extension of the claims raised in his Grounds 3, 4, and 5, Petitioner complains about the testimonial evidence given by Judge Elliott, Chief Taylor, and Ms. Watson, along with the evidence they sponsored, including transcripts from Petitioner's prior court proceedings in 1988 and 1996, a videotape of Petitioner's cross-examination in 1988, and Petitioner's letters.  Petitioner asserts that this evidence was irrelevant and that it "went far, far beyond what was necessary to disprove or prove [his] mental retardation."  Petition, p. 44.  Petitioner asserts that admission of this evidence rendered the proceeding unreliable.

While the OCCA ultimately denied Petitioner relief on this claim, it conducted a thorough analysis of all aspects of the claim.  To the extent the claim incorporated alleged

errors already addressed, the OCCA stood upon its previous rulings.  Howell, 138 P.3d at

558 ("We have already determined portions of Judge Elliott's testimony and Officer Taylor's

testimony, relating to their observations that Howell did not appear to be mentally retarded,

were properly admitted. Similarly, we found admission of the letters written by Howell to

Watson was proper.").  Then, after a discussion of its holding in Lambert, the OCCA began

its detailed examination of the remaining evidence with the following introductory statement:

> Our decision in Lambert clearly envisioned that testimony from a prior
> proceeding might be admissible if it constituted evidence bearing on the issue
> of mental retardation. Here, the complained of evidence is Howell's own
> testimony and his own statements during an *in camera* hearing. We have
> completely reviewed the written transcripts and viewed the videotape. While
> much of the evidence was admissible, certain portions were not and were
> admitted in violation of Lambert.

Id.

The OCCA found no error related to the reading of a transcript from Petitioner's 1996

retrial proceeding.  With respect to this evidence, the OCCA found as follows:

> At this in camera hearing, Howell complained about having to attend
> the hearing and more importantly about his dissatisfaction with one of his
> attorneys and the way the State was handling his court proceedings. We note
> all references to life, life without parole and death were not read to the jury.
> From Howell's testimony at this in camera hearing, a rational jury could figure
> out that Howell understood the system well. He was obviously familiar with
> certain legal principles, and expressed his concerns rationally and coherently.
> His statements were relevant to the issue of mental retardation and showed he
> could understand and process information, communicate, engage in logical
> reasoning and understand the reactions of others. It suggested he does not have
> significant limitations in communication, social/interpersonal skills,
> self-direction, and use of community resources. We find no error in the trial

court's admission of that portion of Judge Elliott's testimony which involved
reading Howell's April 1996 testimony.

Id. at 560.

However, regarding Petitioner's 1988 direct examination testimony which was read

to the jury during Judge Elliott's testimony, the OCCA concluded as follows:

In the first eleven (11) pages of Howell's testimony which was read to
the jury, Howell testified about his involvement in a cocaine drug ring
business. He testified about the operation of the business, told how it worked
on a numbers racket, and how the drug deals took place. Howell testified about
the man in charge of the drug business, described how the drugs and money
were packaged, and how he was involved. Howell's testimony reflected his
ability to respond directly to his counsel's questions and his responses were
coherent and showed he could think and respond logically. The evidence of his
involvement in the drug distribution ring, by way of his own testimony, while
evidence of criminal conduct, was relevant to the issue of mental retardation,
because it showed his ability to think rationally, to follow instructions, and to
be responsible for large sums of money and drugs. See Hooks, 2005 OK
CR 23, ¶ 17, 126 P.3d at 644 (evidence of petitioner's ability to run a
continuing criminal enterprise was relevant to issue of mental retardation).

The remainder, consisting of the specific drug deals leading up to his
meeting with Charlene Calhoun [the murder victim], should not have been
admitted. The portion of his testimony which explained how Calhoun was
involved in the operation and which described their first cocaine exchange was
of minimal relevance. But, more importantly, his testimony about the events
leading up to their next meeting, his description of the elevated emotions
surrounding the impending drug deal, and his description of the actual meeting
with Calhoun suggested that serious criminal conduct followed.

. . . .

The portion of Howell's testimony referencing his contact with
Charlene Calhoun and the events surrounding the drug deal with her, which
led to her murder, should not have been admitted. While Howell's specific
testimony that he shot her was not read to the jury, it was obvious from what
was read that a serious crime had occurred. His testimony surrounding his
meeting with Calhoun are so closely entwined with the actual facts of the

28

crime, i.e. Howell shooting her, that this portion of his testimony should not have been admitted and was admitted in violation of <u>Lambert</u>.

<u>Id.</u> at 559, 560.

In addition, with respect to the videotape of Petitioner's 1988 cross-examination testimony, State's Exhibit 13, the OCCA made a similar finding, i.e., some portions were permissible but other portions should have been excluded.

The beginning of the cross-examination was relevant to the issue of mental retardation. Because Howell waived his presence at the mental retardation jury trial, it was the jury's only opportunity to see Howell's demeanor and the way he communicated with the prosecutor. He answered the prosecutor's questions directly and coherently and was not evasive. At one point, he even attempted to joke with the prosecutor.

Approximately six minutes into the videotaped examination, the prosecutor began to ask questions relating to or referring to Charlene Calhoun. These questions might have been relatively innocuous had the jury not just heard Howell's direct examination testimony of the facts surrounding his meeting with Calhoun, his burning of her truck, and his subsequent flight to Florida. While there was no specific reference to Howell's murder of Charlene Calhoun, there was enough reference to the victim and to his conduct following her murder for the jury to piece together what happened. A portion of this videotape was admitted in violation of <u>Lambert</u>.

<u>Id.</u> at 560.

As to the portions of Petitioner's prior testimony which the OCCA found admissible, the Court noted their relevance in accordance with <u>Atkins</u>.

In <u>Atkins</u>, the Supreme Court observed that "[m]entally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." <u>Atkins</u>, 536 U.S. at 320-321, 122 S.Ct. at 2252. Those portions of Howell's prior testimony which were properly admitted suggest he was able to provide meaningful assistance to his counsel, clearly understood the proceedings, and was not a typically poor

> witness. His demeanor suggested a level of understanding inconsistent with
> mental retardation.

Id. at 560-61. As to the portions which the OCCA found inadmissible, it concluded that any

error which may have occurred was harmless beyond a reasonable doubt.

> [R]eviewing the totality of the evidence presented, we have no grave doubts
> that the outcome of the trial would have been materially affected had the error
> not occurred. Even though the evidence went beyond the scope of Lambert, we
> conclude its admission was harmless beyond a reasonable doubt. Chapman v.
> California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Howell
> did not establish, by a preponderance of the evidence, that he is mentally
> retarded and even if the evidence admitted in violation of Lambert had not
> been admitted, the evidence still would not have supported a verdict that
> Howell is mentally retarded.

Id. at 561.

Having conducted its own thorough review of the entire mental retardation

proceeding, the Court cannot conclude that the OCCA unreasonably denied Petitioner relief

on this claim. To the extent this ground for relief restates Petitioner's claims in Grounds 3,

4, and 5, the Court has already addressed the same and found no relief to be warranted.

Additional analysis is unnecessary. As to Petitioner's challenge to the admission of his prior

testimony, it is clear that much of it was highly relevant to the issue of Petitioner's mental

retardation and therefore properly admitted. Regarding the portions of the prior testimony

which the OCCA found inadmissible pursuant to Lambert, this was a violation of state law,

not Atkins or any other Supreme Court precedent. But in any event, the Court finds that the

OCCA's harmless error determination is reasonable as it is clear that any error which

occurred did not have a "'substantial and injurious effect or influence in determining the

jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 631 (1993) (quoting Kotteakos v.

United States, 328 U.S. 750, 776 (1946)). See Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (the

Brecht standard applies to Section 2254 cases regardless of whether the state court

recognized the error and reviewed it under Chapman v. California, 386 U.S. 18 (1967)).

While there was evidence that Petitioner had scored in the mental retardation range on some

intelligence tests, he had also scored above that range on other occasions.  In addition, other

evidence strongly demonstrated that Petitioner has the intellectual ability to understand and

process information, to communicate, to engage in logical reasoning, and to understand the

reactions of others.  In light of the presented evidence, the Court finds that the Lambert error

did not have a substantial and injurious effect on the jury's determination.  Petitioner's

Ground 9 is denied.


####        f.        Dr. Hutson's Testimony (Grounds 16 & 17).

In his Grounds 16 and 17, Petitioner challenges the testimony of the State's expert,

Dr. Hutson.  In his Ground 16, Petitioner argues that Dr. Hutson's testimony should have

been entirely excluded "when Dr. Hutson demonstrated that he lacked the professional

qualifications to provide, and failed to provide, reliable testimony concerning the existence

of mental retardation." Petition, p. 57.  Citing Daubert v. Merrell Dow Pharmaceuticals, Inc.,

509 U.S. 579 (1993), Petitioner asserts that Dr. Hutson's testimony was inadmissible because

he subjectively testified that the score Petitioner received on the intelligence test he

administered was invalid.  Petitioner also complains about Dr. Hutson's professional guess

as to the minimum score Petitioner could receive on an intelligence test if giving his best effort.   In his Ground 17, Petitioner asserts that Dr. Hutson gave false and misleading testimony when he testified that the Stanford-Binet test given to Petitioner by Dr. Grant was a test intended for use on younger people and that testers usually score six points less on the Stanford-Binet when compared to the WAIS-III.   In support for his Ground 17, Petitioner references testimony given by Dr. Hutson in another proceeding in the early 1990s.   The OCCA addressed the merits of both of these claims through the lens of ineffective of assistance of counsel due to counsel's failure to object.   The OCCA concluded that neither had merit.   Howell, No. PCD-2006-712, slip op. at 8-13.

Although Petitioner argues for relief on his Ground 16 based upon the Supreme Court's holding in Daubert, Daubert concerns the admission of expert testimony in a federal trial and is inapplicable to the review of a state prisoner's habeas petition.   The standard which governs Petitioner's Ground 16 is the general rule of fundamental fairness.   See Wilson, 536 F.3d at 1101-02 ("Because Daubert does not set any specific constitutional floor on the admissibility of scientific evidence, the only relevant question is whether the [admitted evidence] rendered the trial fundamentally unfair."); Williamson v. Ward, 110 F.3d 1508, 1522-23 (10th Cir. 1997) (noting that the district court erred in applying Daubert, instead of the due process/fundamental fairness standard, to the issue of whether hair evidence was properly admitted).   Thus, relief will be warranted only upon a finding that "the state court's evidentiary ruling . . . was 'so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.'"   Wilson, 536 F.3d at

32

1101 (citation omitted).  In applying this analysis, "a federal court must 'tread gingerly' and exercise 'considerable self-restraint.'" Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990)).

In denying Petitioner relief on his Ground 16, the OCCA found that Daubert was inapplicable.  "We do not believe Dr. Hutson's estimate is the type of evidence susceptible to Daubert's admissibility requirements, because it did not purport to have been derived from any particular theoretical framework other than the basic interpretation, or "validation," of raw I.Q. scores, which psychologists routinely do. . . ." Howell, No. PCD-2006-712, slip op. at 8-9.  The OCCA further held, that even if Dr. Hutson's testimony lacked sufficient foundation under Daubert, admission of the testimony did not prejudice Petitioner.

> Both parties presented extensive expert psychological testimony on the issue of Petitioner's mental abilities.  Each party's expert not only administered standard intelligence tests to Petitioner, but also commented on other measures of his abilities, including his adaptive functioning.  *Both* experts used their professional knowledge and experience to "estimate" what they believed Petitioner's true I.Q. to be.  The defense expert, Dr. Grant, interpreted Petitioner's scores on various alternative measures of intelligence, some of which were administered many years ago.  He portrayed Petitioner's scores on some of these tests as possibly inflated due to the so-called "Flynn effect."  However, the State's expert, Dr. Hutson, claimed there is presently no professional consensus on how the Flynn effect should be applied to the interpretation of individual I.Q. scores.  Both experts discussed other factors that bear on the validity of a raw I.Q. score, including the test-taker's motivation on the day of the test, and his familiarity with I.Q. tests in general.  The one universally-accepted test for measuring intelligence on adult subjects that *both* experts happened to administer to Petitioner in this case was the Wechsler Adult Intelligence Scale (WAIS-III).  Interestingly, Petitioner scored 73 (above the legal threshold for raising a mental-retardation claim in this context) when tested by the defense expert, but only 66 (below the legal threshold) when tested by the State's expert.

The extensive evaluations and testimony of both experts, and the disparate scores on the various tests Petitioner had taken over the years, made one thing clear: mental ability is not reducible to a simple numerical value. Even a single I.Q. score must be interpreted, or "validated," by other factors which only the expert test-giver can provide.

In interpreting the plethora of test scores, both experts in this case went well beyond the cold numbers of results; but this was part of their professional responsibilities, and we do not believe either went too far.  Dr. Hutson's estimate of Petitioner's I.Q. was not presented to the jury as anything more than that: an estimate.  An experienced psychologist who had administered many intelligence tests in his thirty-year career, Dr. Hutson told the jury the specific factual bases for his estimate, which included, among many other things, his personal observations of Petitioner (beginning some seventeen years ago) and his review of Petitioner's statements in prior proceedings. From all this information, Dr. Hutson concluded that Petitioner was not mentally retarded - although, to be fair, even Hutson's estimate still placed Petitioner at, or very near, the borderline range, depending on which professional yardstick is used.  The defense expert used similar information to conclude Petitioner *was* mentally retarded.  In short, both experts used a wide array of information, well beyond the raw I.Q. scores, to arrive at their respective conclusions about Petitioner's mental abilities.  For this reason, we do not believe this one aspect of Dr. Hutson's testimony was outcome-determinative.

Id. at 9-11 (footnotes omitted).

Petitioner gives this Court no reason to question the OCCA's determination of this issue.  The OCCA gave this issue extensive analysis, and for the same reasons espoused by the OCCA for finding that this aspect of Dr. Hutson's testimony was not "outcome-determinative," this Court finds that its admission did not render Petitioner's trial fundamentally unfair.

As to Ground 17, the record reflects that Dr. Hutson was asked on direct examination about whether Petitioner's scores of a 73 on the WAIS-III and a 62 on the Stanford-Binet, as administered by Dr. Grant, were consistent.   Dr. Hutson's answer was:

> That's quite a gap.  That's a gap of eleven points.  Now, frankly, the Stanford-Benet [sic] is for a younger population.  Basically it was developed for children and I think the maximum age they recommend using it for is 23 or 25, something of that age.
>
> Sometimes in legal proceedings like this, they tend to give a Stanford-Benet [sic] because adults get a lower score than they're likely to get on the Wechsler, but usually the difference isn't that many points.  Usually it's more like about six points.

(Tr. IV, 701).  Petitioner contends that this testimony is in conflict with testimony Dr. Hutson gave in another, unrelated proceeding.  In that other proceeding held in the early 1990s, Dr. Hutson was questioned about his use of the Stanford-Binet test.

> Q.    All right.  In fact, we've discussed this somewhat, people tend to register a little bit lower on the Stanford-Binet than the Wechsler?
>
> A.    There is a dispute about that.  We have discussed it, and some people do believe that, yes, sir.
>
> Q.    Okay.  Not a significant matter, but there's some thought that - -
>
> A.    Maybe significant.  Nobody seems to really know at this point.

Exhibit 4 (transcript page 845) to Petitioner's Third Application for Post-Conviction Relief, Case No. PCD-2006-712, filed June 29, 2006.

The OCCA reviewed the claim on the merits and concluded that Dr. Hutson's testimony in the present case was neither false nor misleading.

We disagree with Petitioner's characterizations of the evidence. First, we note that the prior testimony Petitioner has preferred was given by Dr. Hutson some *thirteen years* before Petitioner's mental-retardation trial. Hutson testified that he administered the Stanford-Binet instrument, among other tests, to the defendant in that case. He agreed with the prosecutor that the Wechsler instrument was traditionally the test given to adults, and there was some evidence that subjects tend to score lower on the Stanford-Binet than on the Wechsler. When the prosecutor conceded that the disparity was perhaps insignificant, Hutson disagreed: "*Maybe significant. Nobody seems to really know at this point.*" Moving forward many years to Petitioner's trial, Dr. Hutson testified that the Stanford-Binet instrument was "developed for children" and "I think the maximum age they recommend using it for is 23 or 25, something of that age." However, Dr. Hutson did *not* claim that the use of the Stanford-Binet on a subject over that age (such as Petitioner) was invalid. In fact, he testified that the Stanford-Binet was sometimes used in "legal proceedings like [Petitioner's]," and that while adults might achieve a lower score on that test as opposed to the Wechsler, "usually the difference isn't that many points . . . like about six points." The point Dr. Hutson was making was that the *eleven-point* difference between Petitioner's scores on the Wechsler and the Stanford-Binet instruments was of some concern to him. Even ignoring the fact that scientific knowledge, and therefore expert opinion, can evolve dramatically over a thirteen-year period, Hutson's prior testimony was not "precisely the opposite" of his testimony in Petitioner's trial, as Petitioner claims. We discern nothing remotely false or misleading about Hutson's testimony on these issues. . . .

Howell, No. PCD-2006-712, slip op. at 12-13 (footnote omitted).

Again, Petitioner has failed to demonstrate that the OCCA's determination of this issue is contrary to or an unreasonable application of Supreme Court law. For the reasons set forth herein, the Court finds that the OCCA reasonably denied Petitioner relief on this claim as well, and that none of Dr. Hutson's complained-of testimony served to deny Petitioner a fundamentally fair trial. Accordingly, Grounds 16 and 17 are hereby denied.

### 3.     Instructions.

In his Grounds 7, 8, 10, and 18, Petitioner challenges the instructions given to the jury. To obtain relief for an instructional error, a habeas petitioner must meet a heavy burden. "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977).   It is not enough to show that the instruction was "undesirable, erroneous, or even 'universally condemned. . . .'" Cupp v. Naughten, 414 U.S. 141, 146 (1973).   The standard is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  Id.  at 147.

### a.     Present and Known (Ground 7).

In his Ground 7, Petitioner complains about the use of the language "present and known."  In setting forth the definition of mental retardation, the jury was asked to determine whether the mental retardation was "present and known before the Defendant was eighteen years of age" (O.R. 75).  Petitioner asserts that this language conflicts with Atkins because it "only requires that a defendant meet the generally accepted clinical definition of mental retardation of having it *manifest* itself prior to age eighteen."  Petition, p. 41 (emphasis added).  It is Petitioner's contention that "present and known" is a more stringent standard than "manifest."  Petition, p. 42.

The OCCA relied upon its previous holding in <u>Myers v. State</u>, 130 P.3d 262 (Okla. Crim. App. 2005), to deny Petitioner relief on this claim.  <u>Howell</u>, 138 P.3d at 558.  In <u>Myers</u>, the OCCA held as follows:

> Jury instructions are sufficient if, when read as a whole, they state the applicable law. <u>McGregor v. State</u>, 1994 OK CR 71, ¶ 23, 885 P.2d 1366, 1380. As used in this context, the word "manifest" is a transitive verb and the word "known" is an adjective. The *Random House Unabridged Dictionary* defines "known" as perceived or understood as fact or truth; apprehended clearly and with certainty. *See* "know" & "known" *Random House Dictionary* (2nd ed.1997). It defines "manifest" as "to make clear or evident to the eye or the understanding; show plainly ... to prove; put beyond doubt or question." *See* "manifest" *Random House Dictionary* (2nd ed.1997).

> We find that the words "present and known" are words of common everyday understanding that do not require a level of proof above that required to prove that a condition "manifested" itself. "Known" as it relates to the jury instruction used in this case does not require a scientific finding or a medical diagnosis. <u>See</u> <u>Murphy I</u>, 2002 OK CR 32, ¶ 31 n.19, 54 P.3d at 567 n.19.[12] The retardation has only to have been perceived or recognized by someone before the defendant reached the age of 18. The court's instruction accurately

---

[12] In this footnote in <u>Murphy I</u>, the OCCA stated as follows:

"Manifestation before the age of eighteen" is a fact question intended to establish that the first signs of mental retardation appeared and were recognized before the defendant turned eighteen. Lay opinion and poor school records may be considered. Thus, a defendant need not, necessarily, introduce an intelligent quotient test administered before the age of eighteen or a medical opinion given before the age of eighteen in order to prove his or her mental retardation manifested before the age of eighteen, although such proof would surely be the more credible of that fact.

> stated the applicable law and therefore we find that the district court did not abuse its discretion in giving this uniform instruction.

Myers, 130 P.3d at 269.

Just as Myers failed in his attempt to obtain habeas relief on this claim, Myers v. Workman, No. 02-CV-140-GKF-PJC, 2010 WL 2106456, at *58-59 (N.D. Okla. May 25, 2010) (unpublished), Petitioner does as well.  The OCCA's determination of this claim is reasonable, and Petitioner's arguments are unavailing.  As the Northern District found in Myers, "[t]he trial court's instruction defining mental retardation was narrowly tailored in response to the Supreme Court's mandates in Atkins."  Id. at *59.  The use of the language "present and known" instead of "manifest" did not violate Atkins.  In addition to the fact that these terms have similar meanings, Atkins does not require a particular definition for mental retardation.  Atkins, 536 U.S. at 317 & n.22.  Ground 7 is denied.

**b.     Non-Unanimous Verdict Forms (Ground 8).**

In his Ground 8, Petitioner asserts that the jury should have been given non-unanimous verdict forms and advised that its decision need not be unanimous.  In support of his argument, Petitioner relies upon Lambert wherein the OCCA held as follows:

> The jury's finding will determine the validity of Lambert's capital sentence. If jurors determine Lambert is not mentally retarded, his death sentence will stand. If jurors determine Lambert is mentally retarded, the death sentence cannot stand. The trial court will resentence Lambert to life imprisonment without parole. *If there is no unanimous verdict either finding or rejecting mental retardation, the trial court will resentence Lambert to life imprisonment without parole. This is in keeping with the low burden of proof; on a question of this constitutional magnitude, if jurors cannot agree on*

> *whether it is more likely than not that Lambert is retarded, Lambert will*
> *receive the benefit of that doubt.*

Lambert, 71 P.3d at 32 (emphasis added).

Petitioner presented this claim to the OCCA without success.  Again, the OCCA relied

upon Myers to deny relief.  Howell, 138 P.3d at 558.  In Myers, the OCCA held as follows:

> Requiring a unanimous verdict on the issue of mental retardation does
> not violate Atkins, Murphy I, or Lambert. It neither increases the likelihood
> that a mentally retarded person will be executed nor does it force jurors to vote
> for a particular position. A unanimous decision is also required by our state
> constitution in all criminal cases other than misdemeanors. Okla. Const. art. II,
> § 19. Lambert provides a procedure for a jury that cannot unanimously agree
> that a defendant is mentally retarded. In that instance, the benefit of the doubt
> goes to the defendant and the district court resentences the defendant to life
> imprisonment without the possibility of parole. Lambert, 2003 OK CR 11, ¶ 5,
> 71 P.3d at 32. Nothing in Atkins, Murphy I or Lambert requires the jury to be
> told what happens if it cannot reach a unanimous verdict. This claim is denied.

Myers, 130 P.3d at 269 (footnote omitted).

As the Northern District found in Myers, 2010 WL 2106456, at *59, Petitioner fails

to cite any "language in Atkins, or any other decision of the Supreme Court or the Tenth

Circuit, to support his argument that the OCCA's decision was an unreasonable application

of Supreme Court law. Nor has this Court found such case."  Moreover, in the present case,

the jury returned a unanimous verdict.  Each juror was polled and each verified that the

verdict reflected his or her personal decision.  There is no indication that the absence of a

non-unanimous verdict form affected the jury's verdict (Tr. IV, 818-20).  Because Petitioner

has not demonstrated a denial of due process, his Ground 8 is rejected.

### c.      Burden of Proof (Ground 10).

In his Ground 10, Petitioner complains about the burden of proof utilized at his mental retardation trial.  In Murphy v. State, 54 P.3d 556, 568 & n.20 (Okla. Crim. App. 2002), the OCCA held that it is the defendant's burden to prove his mental retardation by a preponderance of the evidence.  Petitioner contends that in accordance with Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), the State should be required to show, beyond a reasonable doubt, that he is not mentally retarded (and, therefore, may receive the death penalty).

In Apprendi, 530 U.S. at 490, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  In Ring, the Supreme Court extended Apprendi to capital cases.  Ring, 536 U.S. at 589 ("Capital defendants, no less than noncapital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.").  In denying Petitioner relief on his Ground 10, the OCCA discussed both Apprendi and Ring, but found that neither required the relief Petitioner requested.

> The Oklahoma legislature has not conditioned an increase in a defendant's maximum punishment on the fact that he is not mentally retarded; the fact a defendant is not mentally retarded is not an aggravating circumstance which the State must prove beyond a reasonable doubt. 21 O.S.2001, § 701.12. Eligibility for the death penalty is a different issue than proof of an aggravating circumstance.

> . . . .

41

> Mental retardation is a complete bar to the imposition of the death penalty; it is different from a statutory aggravating circumstance which increases the punishment for an offense, and we conclude that the holdings in Ring and Apprendi, in our opinion, do not require the State to prove the lack of mental retardation beyond a reasonable doubt.

Howell, 138 P.3d at 561, 562.

The OCCA's interpretation and application of Apprendi and Ring is reasonable. In Atkins, the Supreme Court acknowledged that despite a national consensus that execution of the mentally retarded offender should be prohibited, there was disagreement among the States in determining which offenders are in fact retarded. Atkins, 536 U.S. at 316-17 ("Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus."). Accordingly, the Supreme Court empowered each State to develop its own procedures for the determination of the mentally retarded. Id. at 317. Oklahoma has done so, and in so doing, has placed the burden of proof upon the defendant. The Court finds that nothing in Atkins, Apprendi, or Ring prohibits this. See In re: Johnson, 334 F.3d 403, 405 (5th Cir. 2003) ("[N]either Ring and Apprendi nor Atkins render the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt."); Ochoa, 2010 WL 915826, at *4-6 (rejecting a challenge to Oklahoma's preponderance of the evidence burden of proof); Ferrell v. Head, 398 F.Supp.2d 1273, 1295 (N.D. Ga. 2005) (denying petitioner's challenge to Georgia's procedure which required him to prove his mental retardation beyond a reasonable doubt; "Atkins makes it abundantly clear that each state is permitted to design its own system for determining mental retardation,

42

insofar as such system does not wholly erode the constitutional prohibition against execution of the mentally retarded."), rev'd on other grounds sub nom. Ferrell v. Hall, 640 F.3d 1199 (11th Cir. 2011). Petitioner's Ground 10 is denied.

### d.   Definition of Mental Retardation (Ground 18).

In his Ground 18, Petitioner complains once again about the instruction defining mental retardation. Petitioner's assertion here is that the instruction violated Atkins because it "deviated markedly from the accepted clinical definition of mental retardation." Petition, p. 59. In particular, Petitioner asserts that the instruction

> defined mental retardation solely as significantly sub-average intellectual functioning which "substantially" limits certain abilities, without relating those abilities to the accepted domains of adaptive behavior that comprise the second element of the accepted clinical definition of mental retardation, and without explaining that the intelligence quotient as determined by a reliable IQ test is determinative of the element of significantly sub[-]average intellectual functioning.

Id.

The jury in Petitioner's case was instructed as follows:

> The Defendant has raised mental retardation as a sentencing issue in this case. You must determine if the Defendant suffers from mental retardation. The Court will then determine the proper sentence for the crime of which the Defendant is convicted. It is the Defendant's burden to prove by a preponderance of the evidence that he is mentally retarded.

> In making your determination, you are to use the definition of mental retardation which follows:

> You are advised that a person is "mentally retarded" if he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability:

☐ to understand and process information,
☐ to communicate,
☐ to learn from experience or mistakes,
☐ to engage in logical reasoning,
☐ to control impulses,
☐ and to understand the reaction of others.

Intelligence quotients are one of the many factors that may be considered, but are not alone determinative.  In reaching your decision, you must determine:

1. Is the Defendant a person who is mentally retarded as defined in this Instruction?

2. Was the mental retardation present and known before the Defendant was eighteen years of age?

3. Does the Defendant have significant limitations in adaptive functions in at least two of the following skill areas:

☐ Communication;
☐ Self-care;
☐ Social/interpersonal skills;
☐ Home living;
☐ Self-direction;
☐ Academics;
☐ Health and safety;
☐ Use of community resources;
☐ And work.

If you find by a preponderance of the evidence that the answer to each of these questions is yes, then you must so indicate on your verdict form.

If you find the answer to any of the above questions is no, then you must find that the Defendant is not mentally retarded and so indicate on your verdict form.

(O.R. 74-76).  The OCCA found no error in the instruction given.  Howell, No. PCD-2006-

712, slip op. at 13-15.  In sum, the OCCA found that "the instructions, read as a whole,

accurately stated the law, whose parameters were enunciated by the Supreme Court in

Atkins, and which this Court refined in Murphy." Id. at 14.

This was the same instruction given in Hooks v. Workman, 693 F.Supp.2d 1280,

1290-91 (W.D. Okla. 2010).  In Hooks, the Court found that this instruction was not contrary

to or an unreasonable application of Atkins.

> Oklahoma's definition closely parallels the Supreme Court's reference
> to recognized associations' definitions of mental retardation. The procedures
> set forth in Murphy and Lambert, and utilized in Petitioner's trial, were
> narrowly tailored in response to the Supreme Court's determination to leave
> to the states the task of developing appropriate ways to enforce the
> constitutional restriction announced in Atkins. Petitioner has not demonstrated
> Oklahoma's definition or overall procedure for mental retardation trials in
> capital cases to be either contrary to, or an unreasonable application of, clearly
> established federal law as determined by the Supreme Court.

Id. at 1291.  The Court concurs with the decision reached in Hooks and denies Petitioner's

Ground 18.

### 4.    Jury Issues.

### a.    Batson.

In his Ground 12, Petitioner alleges a violation of Batson v. Kentucky, 476 U.S.

79 (1986).  Batson stands for the well-established principle that a prosecutor cannot use a

peremptory challenge to remove a potential juror "solely on account of their race."  Batson,

476 U.S. at 89.  In Batson, the Supreme Court set forth the standard to evaluate such claims.

> First, the defendant must make a prima facie showing that the prosecutor has
> exercised peremptory challenges on the basis of race. Second, if the requisite
> showing has been made, the burden shifts to the prosecutor to articulate a
> race-neutral explanation for striking the jurors in question. Finally, the trial

court must determine whether the defendant has carried his burden of proving purposeful discrimination.

Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (citing Batson) (citations omitted). Comparing jurors Lee and Simms, who were removed by the prosecution with peremptory strikes, to similarly situated jurors Foughty, Penhall, Lauhon, and Kelley, who remained on the jury, Petitioner contends that jurors Lee and Simms were removed because of their race.

Petitioner presented this claim to the OCCA. The OCCA reviewed the claim in the context of ineffective assistance of counsel due to trial counsel's failure to object to the removal of jurors Lee and Simms. The OCCA found no merit to the claim. In addition to finding that trial counsel's failure to object was strategic, the OCCA also found that Petitioner had "failed to demonstrate that the prosecutor lacked a race-neutral explanation for the strikes he complains about." Howell, No. PCD-2006-712, slip op. at 4-5.

Because of trial counsel's failure to object at trial to the removal of jurors Lee and Simms, the record is devoid of the information necessary to assess a Batson claim. The OCCA denied Petitioner relief because he failed to show that the prosecutor lacked a race-neutral reason for striking the jurors. This reason for denial is reasonable, but the more obvious failure in Petitioner's claim is his failure to make to a prima facie case that jurors Lee and Simms were removed due to their race. Petitioner states, without any support, that jurors Lee and Simms are African-American and that jurors Foughty, Penhall, Lauhon, and Kelley are white. As Respondent points out, the race of these jurors is not borne out by the

record.  Petitioner fails to demonstrate a <u>Batson</u> violation, and therefore, his Ground 12 is

denied.

###    b.    Jury Deliberations (Ground 13) and Voir Dire (Ground 14).

In his Ground 14, Petitioner alleges that a juror failed to disclose in voir dire that he

"knew of" Petitioner's co-defendant, Ms. Watson, and the details of Petitioner's crime.  In

his Ground 13, Petitioner additionally alleges the jurors "knew, discussed, and considered"

the facts of his crime and that he was convicted of murder and sentenced to death.  Petition,

pp. 49-50. Petitioner asserts that <u>Atkins</u> entitles him to relief on these claims.

In support of his claim, Petitioner presents an affidavit from an investigator who

interviewed three jurors.  This affidavit, which was presented to and considered by the

OCCA, <u>see</u> <u>Pinholster</u>, 131 S.Ct. at 1398 ("[R]eview under § 2254(d)(1) is limited to the

record that was before the state court that adjudicated the claim on the merits."), contains the

following relevant declarations:

> 4.    On November 10, 2005, I interviewed Robert Heaslet, who was the
> foreman of the Oklahoma County jury which heard Michael Howell's
> mental retardation claim in 2005.  Mr. Heaslet stated that, when he sat
> as a juror, he was familiar with the United States Supreme Court
> decision that mentally retarded defendants can not be executed.  He
> figured that if they had gone to the trouble to have a trial, that it was a
> death row case.  I asked if he had discussed this realization with the
> other jurors before they went into the jury room to deliberate.  He said
> they did not discuss it until they got into the jury room, but they did
> discuss it when they went back to deliberate.  Mr. Heaslet shared his
> knowledge with the other jurors.

> 5.    On November 9, 2005, I had interviewed Brian Foughty, who also was
> a juror in Michael Howell's Oklahoma mental retardation trial.  He said
> that on the second or third day of the trial, when he heard Mona Lisa

Watson's name, he remembered the facts of the case: the murder, burned car and a body abandoned. He was cautious not to talk about his realization until he got into the jury room, and then they discussed it. He likened the initiation of the discussion as: "OK, who doesn't know what this is about?"

6.       On November 7, 2005, I interviewed Jessica Penhall, who like Mr. Heaslet and Mr. Foughty, was a member of the Oklahoma mental retardation jury. She said that she figured that Michael Howell was on death row after a couple of days but didn't discuss it until she got to the jury room. She explained that in the jury room, one of the jurors knew that "mental retardation was a solution to the death penalty." When that one juror spoke up, it turned out that "half of the jurors" had figured out that Michael Howell was on death row.

Exhibit 2 to Petitioner's Third Application for Post-Conviction Relief, Case No. PCD-2006-712, filed June 29, 2006.

In denying Petitioner's claims, the OCCA held as follows:

The posture of Petitioner's mental-retardation trial is a situation similar to retrials and resentencing proceedings. In such situations, jurors may inadvertently learn, or simply infer, certain details about the defendant's prior proceedings, despite the best efforts of the court and counsel to avoid such issues. We may, of course, consider whether evidence was improperly introduced in the courtroom. While we may consider whether information was presented to the jury through extraneous channels, we may not inquire into how that information might have affected the deliberative process itself. 12 O.S.Supp.2002, § 2606(B); Ritchie v. State, 1998 OK CR 26, ¶ 12, 957 P.2d 1192, 1197-98.

Yet, Petitioner does not claim that his jury was deliberately informed that he had been convicted of capital murder, either from information presented in the courtroom, or from some improper extraneous agent. He simply complains that some jurors were able to infer things that were not squarely presented in evidence, using their common sense and general awareness of public affairs. Petitioner cites no authority for the proposition that jurors should be, or indeed ever *could* be, prevented from doing so. We have often observed that jurors are not required to be totally ignorant of the case they are empaneled to try. See generally Dodd v. State, 2004 OK CR 31,

¶ 76, 100 P.3d 1017, 1040; <u>Romano v. State</u>, 1995 OK CR 74, ¶¶ 49-52, 909 P.2d 114-15; <u>Brecheen v. State</u>, 1992 OK CR 42, ¶ 11, 835 P.2d 117, 120. We see no reason to except post-conviction, mental-retardation juries from this rule.  The mere fact that Petitioner had been convicted of capital murder may not have been directly relevant to whether he was mentally retarded.  <u>Howell</u>, 2006 OK CR 28 at ¶ 22, 138 P.3d at 558.  That does not mean, however, that his jury was necessarily tainted simply because some jurors began to suspect as much as the trial progressed.

Petitioner's only avenue for relief in this context is to show that a juror violated his or her oath to render a verdict based on the evidence presented in court. 22 O.S.2001, § 952; <u>Brecheen v. State</u>, 1987 OK CR 17, ¶ 18, 732 P.2d 889, 894, <u>overruled on other grounds</u>, <u>Brown v. State</u>, 1994 OK CR 12, 871 P.2d 56.  This Petitioner has failed to do.  None of the three jurors mentioned in the investigator's affidavit even suggested that they deliberately withheld information (much less hid a preconceived opinion about Petitioner's mental abilities) during *voir dire*, or that the inferences they were able to make during the trial affected their ability to render a verdict according to their instructions. . . . Petitioner's substantive claims here are meritless.

<u>Howell</u>, No. PCD-2006-712, slip op. at 6-8.

In <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961), the Supreme Court acknowledged that

"jurors [need not] be totally ignorant of the facts and issues involved."

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay

aside his impression or opinion and render a verdict based on the evidence presented in court.

Id. at 722-23.  In Petitioner's case, there is no indication that any jurors came into it with any preconceived notions, nor is there any evidence that juror Foughty lied during voir dire.[13] See United States v. McConnel, 464 F.3d 1152, 1157 (10th Cir. 2006) ("Defendant is entitled to a new trial if he can show that the juror failed to honestly answer a material question on voir dire and that a correct response would have provided a valid basis for a challenge for cause.").  In addition, Petitioner does not allege that the deliberation process was affected by the infusion of information from outside sources.  See Matthews v. Workman, 577 F.3d 1175, 1181 (10th Cir. 2009) ("A jury's verdict 'must be based upon the evidence developed at trial,' not on extraneous information presented outside 'a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel[.]'") (citations omitted).  What the record shows is that as the trial progressed, some of the jurors figured out on their own what was going on.  The OCCA did not unreasonably determine that these circumstances alone did not entitle Petitioner to relief. Petitioner's Grounds 13 and 14 are therefore denied.

### 5.      Ineffective Assistance of Trial Counsel (Ground 15).

In his Ground 15, Petitioner argues several instances of trial counsel ineffectiveness. While many of the claims relate to other grounds already addressed herein, some are presented here for the first time.  The OCCA addressed all of these claims on the merits and denied Petitioner relief.  Howell, No. PCD-2006-712, slip op. at 4-21.  For the following

---

[13] See Howell, No. PCD-2006-712, slip op. at 6 n.4.

reasons, the Court finds that Petitioner has failed to show that the decision of the OCCA is

contrary to or an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

To obtain relief under <u>Strickland</u>, a petitioner must show that his counsel's

performance was deficient and that he was prejudiced by it.  <u>Strickland</u>, 466 U.S. at 687.  The

assessment of counsel's conduct is "highly deferential," and a petitioner must overcome the

strong presumption that counsel's actions constituted sound trial strategy.  <u>Id.</u> at 689.  While

"[s]urmounting <u>Strickland's</u> high bar is never an easy task[,]" the difficulty is intensified

when a petitioner seeks habeas relief on a <u>Strickland</u> claim.  Given the deference afforded

to state court decisions by the AEDPA, the deference given to a <u>Strickland</u> claim is

effectively doubled.   <u>Knowles v. Mirzayance</u>, 556 U.S. 111, ___, 129 S.Ct. 1411,

1420 (2009).  <u>See</u> <u>Pinholster</u>, 131 S.Ct. at 1403 ("We take a 'highly deferential' look at

counsel's performance . . . through the 'deferential lens of § 2254(d). . . .'") (citations

omitted).

a.    **Grounds 12 through 14 and 16 through 18 (Grounds 15(a)-(e) & (g))**.

In his Ground 15, Petitioner alleges that his trial counsel failed to act in some manner

relating to the claims raised in his Grounds 12, 13, 14, 16, 17, and 18.  The Court has already

addressed these underlying claims and found that Petitioner has not demonstrated his

entitlement to relief with respect thereto.  The OCCA addressed each of these claims together

with Petitioner's companion claim of trial counsel ineffectiveness.  For the reasons already

set forth herein, as well as the additional analysis given by the OCCA, the Court finds that

the OCCA's decision denying relief is not contrary to or an unreasonable application of

Strickland.  See Freeman v. Att'y Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim. . . ."); Snow v. Sirmons, 474 F.3d 693, 724-25 (10th Cir. 2007) (trial counsel was not ineffective for failing to object to certain evidence which the OCCA found admissible); Spears, 343 F.3d at 1249 (trial counsel was not ineffective for failing to object to the giving of a flight instruction where the OCCA found that sufficient evidence supported the giving of the instruction).

> **b.** **Failure to Present Evidence that Petitioner Was in Special Education Classes (Ground 15(f)).**

In his Ground 15(f), Petitioner asserts that his trial counsel was ineffective for failing to investigate and/or present significant evidence of his mental retardation.  Petitioner's particular complaint is that his trial counsel should have presented evidence from Gail Graves Bridges that Petitioner was in her special education class and that he had intellectual deficits. See Exhibit 2 to Petitioner's Third Application for Post-Conviction Relief,  Case No. PCD-2006-712, filed June 29, 2006.

The OCCA addressed this claim and found it to be without merit.  The OCCA described the information provided by Petitioner in support of his claim as "a brief, second-hand affidavit from an investigator."  Its relevance was in countering the State's argument that Petitioner was not in special education classes.  Howell, No. PCD-2006-712, slip op. at 20.

> At trial, Petitioner presented testimony from family members which, if believed, tended to show that he may have had some learning deficits from an

early age.  Petitioner's younger sister testified to helping him dress and to teaching him the alphabet when he was nine years old.  Petitioner's brother testified that he attended special-education class at school, and that Petitioner was in the same class.  The State countered this testimony by pointing out that none of Petitioner's school records specifically indicated that he was in need of "special education."  Petitioner's own psychological expert admitted that the evidence was ambiguous on this point.  Yet the second-hand information from Bridges sheds no light on why Petitioner's school records do not specifically indicate special-education status.  Of course, whether Petitioner was actually designated in need of "special education" by school officials is not, itself, the ultimate issue; such designation is only an indicator of possible mental retardation that the jury could consider along with other evidence.  The few details provided by the investigator's affidavit – that Bridges felt Petitioner had poor reading skills, the rather generic claim that he "definitely had deficits," and the fact that he had "no home supports" were evident from other testimony, including Petitioner's siblings as well as his childhood test scores and school grades.  Given this evidence, along with extensive testimony from the defense expert, we fail to see how the very cursory information Petitioner

provides from Bridges would have added materially to the defense case, or how it could have altered the outcome of the trial.

Id. at 20-21 (citation omitted).

The OCCA's analysis of this claim is sound, and Petitioner has given this Court no reason to conclude otherwise. Contrary to Petitioner's characterization, the Bridges evidence is not "significant" given the other evidence presented at trial. Through Petitioner's siblings, trial counsel presented evidence of Petitioner's childhood learning difficulties, and Petitioner's brother testified that Petitioner was in special education classes with him. Nevertheless, while Petitioner and his siblings attended the same schools, Petitioner's school records do not show any special education placement, while the records of his siblings do (State's Exhibits 14 and 15; Defendant's Exhibit 26). The information provided by Petitioner still does not explain this discrepancy and offers little more than what was already presented at trial. Under these circumstances, Petitioner's claim fails.

### c. Trial Counsel's Failure to Object (Ground 15(h)).

In his Ground 15(h), Petitioner lists eight trial matters to which trial counsel should have entered an objection. In the first instance, Petitioner points to the State's questioning in voir dire. Petitioner contends that his trial counsel should have objected to the prosecutor's "litmus test" for the determination of mental retardation. Petitioner references questions where the prosecutor asked jurors about their interaction with mentally retarded persons. The prosecutor asked the jurors how they knew these persons had mental disabilities and what types of jobs they were able to perform (Tr. I, 186, 187, 195. 201). A

review of these references shows that the questions were relevant and that the prosecutor did

not in any way put forth her own test for mental retardation.  Therefore, the Court cannot

conclude that the OCCA acted unreasonably in its denial of this claim.  Howell,

No. PCD-2006-712, slip op. at 16.

Next, Petitioner asserts that trial counsel should have objected when the trial court,

during a lull in proceedings, told the jury a story in which he ridiculed and disparaged a drug

offender.  Petitioner contends that this story was improper because the evidence showed that

he, too, had been involved in drug activity.  Although this incident was not transcribed, it is

relayed through an affidavit of one of Petitioner's Tennessee attorneys:

> The judge related that a man had been arrested on the charges of drug
> possession and was taken to jail.  The man then made bond.  The person who
> made the man's bond came to pick him up at the jail.  The Judge then stated,
> that "Of course, they immediately went to buy more drugs."  After buying the
> drugs, the Judge said the men began to drive behind a large white van.  "And,
> like the idiots they were" the men started following the van very closely.  The
> van however, did not speed up.  Eventually, the men passed the van.  The van
> began to follow the two men closely.  So, the men pull into a gas station and
> get out of their car in order to confront the driver of the van.  To their surprise,
> an entire SWAT team, dressed out in black and armed with semi-automatic
> weapons, piled out of the white van.  The men were arrested and went back to
> jail.

Exhibit 3 to Petitioner's Third Application for Post-Conviction Relief, Case No. PCD-2006-

712, filed June 29, 2006.

The OCCA reviewed this claim and found that it warranted no relief.  In particular,

the OCCA held:

> The gist of Petitioner's argument seems to be that the anecdote offered an
> unflattering assessment of people who commit crimes.  But the jury's task here

56

was not to determine whether Petitioner had committed a crime.  Indeed, the fact that Petitioner had a criminal history was never in dispute.  Rather, the jury's sole task was to determine whether or not Petitioner was mentally retarded, and the trial judge's anecdote (as related by an investigator's [sic] affidavit) made no comment on the credibility of Petitioner's mental-retardation claim.  Defense counsel was not ineffective for failing to object to the court's comments.

Howell, No. PCD-2006-712, slip op. at 16-17.  Because Petitioner has failed to show that the OCCA's analysis of this claim is unreasonable, this claim is denied.

Petitioner's next three complaints concern Judge Elliott's testimony.  Petitioner asserts that trial counsel should have (1) objected to Judge Elliott's testimony that Petitioner is mentally capable of understanding and processing information, communicating, learning from experience or mistakes, engaging in logical reasoning, controlling his impulses, and understanding the reactions of others; (2) *properly* objected to Judge Elliott's testimony that no concerns were ever raised about Petitioner's ability to testify in his first trial based on attorney/client privilege;[14] and (3) objected to Judge Elliott's reading of transcript evidence "when the transcripts speak for themselves . . . and where Elliott's intonation and manner of presentation of the testimony gave the jury an unfavorable impression of [Petitioner] that was not accurate."   Petition, pp. 54-55.

As to the first claim, the OCCA found that trial counsel was not ineffective in failing to object because Judge Elliott's testimony was proper lay opinion.  Howell, No. PCD-2006-712, slip op. at 17.  As to the second claim, the OCCA found that the testimony given did not

---

[14] See Petitioner's Ground 4, as discussed in Section IV.B.2.b., supra.

relate to a matter of privilege.  "The point of the testimony was to show that, *to the prosecutor's knowledge*, no question about Petitioner's mental abilities (as evidenced, *e.g.*, by an application for determination of competency to stand trial, or advancement of some sort of diminished-capacity defense) had been raised in Petitioner's murder prosecution. Such expressions of concern could certainly be relevant to the issue of mental retardation. . . ."  Id. at 18.  As to the third claim, the OCCA found that Petitioner had failed to demonstrate how the reading of the testimony was unfairly prejudicial.  Id.

Again, Petitioner fails to demonstrate how the OCCA's resolution of these claims resulted in a decision that is contrary to or an unreasonable application of Supreme Court law.  Especially in light of the high hurdle that Petitioner must overcome to obtain habeas relief on a Strickland claim, it is readily apparent that Petitioner's arguments fall short.

Petitioner's next three claims are also related in that Petitioner asserts his trial counsel failed to object to certain comments/questions by the prosecutor which he alleges had the effect of denigrating his defense.  As did the OCCA, the Court has reviewed the comments/questions and finds that none were improper and/or tactically motivated to disparage Petitioner or his defense.  Howell, No. PCD-2006-712, slip op. at 18-20.  The prosecutor's comment in opening statement was nothing more than a discussion of the evidence that was going to be presented.  Petitioner reads much more into this comment than the transcript reveals.[15]  Petitioner's two other complaints are with questions posed to Dr.

---

[15] The prosecutor stated as follows:

Grant on cross-examination.  The Court finds that these comments were within the proper scope of cross-examination and thus any objection by trial counsel would have been for naught.  See United States v. Troutman, 814 F.2d 1428, 1450 (10th Cir. 1987) ("Cross examination 'may embrace any matter germane to the direct examination, qualifying or destroying, or tending to elucidate, modify, explain, contradict, or rebut testimony given in chief by the witness.'") (citation omitted).  For these reasons, the OCCA did not act unreasonably in denying these claims.

> ### d.    Conflict of Interest (Ground 15(I)).

In his Ground 15(I), Petitioner asserts that his trial counsel was ineffective because he was burdened with a conflict of interest.  Petitioner contends that a conflict existed because he was represented at his mental retardation trial by the Oklahoma Indigent Defense System and Ms. Watson, his co-defendant, was previously represented by them.  The OCCA denied this claim because it lacked support with argument and authority.  Howell, No. PCD-2006-712, slip op. at 21.  Respondent contends that this Court should deny Petitioner relief for the same reason.

---

And so we go on.  In 2002, Michael Wayne Howell hires another expert.  He hires Dr. Daniel Grant.  And you will find that the issue at the time of the evaluation in 2002 was specific to the question of, is Michael Wayne Howell mentally retarded.  In 1988, that was not the issue at that time.  That was testing that was done, but that was not the issue.  That was just information that came out of other testing.

In 2002, that's the issue and Daniel Grant tests him and gives him the Wechsler.  It's an updated version of the Wechsler because time passes and they update the test.  Michael Wayne Howell got a visual I.Q. of 75, he got a performance I.Q. of 74, and he got a full scale I.Q. of 73.  Still three points above the 70.

(Tr. II, 278).

To establish a conflict of interest where no objection was made at trial, a petitioner must show that an actual conflict existed. The actual conflict must have directly affected the adequacy of trial counsel's representation, and it is a petitioner's burden to show specific instances of conduct which support his contention that a conflict existed. Gardner v. Galetka, 568 F.3d 862, 886 (10th Cir. 2009). Both Respondent and the OCCA are correct that Petitioner has failed to demonstrate that a conflict existed. The fact that Petitioner and Ms. Watson *were* co-defendants regarding the murder charge, for which each was found guilty years before, does not establish that any conflict existed when Ms. Watson testified as a State's witness at Petitioner's mental retardation trial. Petitioner has failed to cite any specific instances in which his counsel's representation was impinged by the former representation of Ms. Watson. This claim is therefore denied.

## V.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to the requested relief. Accordingly, Petitioner's Petition, Doc. 22, is hereby **DENIED**. A judgment will enter accordingly.

IT IS SO ORDERED this 28th day of October, 2011.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

60